Charles K. Chineduh (SBN 273258)
Charles.Chineduh@maynardnexsen.com
MAYNARD NEXSEN LLP
2121 Avenue of the Stars, Suite 650
Los Angeles, CA 90067
Telephone: (310) 596-4500

Attorney for Defendants
CENTENE CORPORATION and
HEALTH NET, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWARD CLARK, JR., individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> CENTENE CORPORATION and HEALTH NET, LLC, <br><br> Defendants. | Case No. 2:26-cv-8955-MCS-DMK <br><br> **NOTICE OF RELATED CASE** |

Pursuant to Local Rule 83-1.3, Defendants Centene Corporation ("Centene") and Health Net, LLC ("Health Net," together with Centene, "Defendants"), by and through undersigned counsel, hereby notify the Court that this action involves a material part of the same subject matter and all or nearly all of the same parties as an action currently pending in the United States District Court for the Central District of California: *Steve Shannon and Rebekka Lien v. Health Net, LLC*, Case No. 2:26-cv-03814-RGK-E, filed on April 9, 2026 (the "Shannon Action"). A copy of the operative Amended Complaint in the Shannon Action is attached hereto as **Exhibit A**.

## I.    THIS ACTION

Plaintiff Howard Clark, Jr. filed this lawsuit individually and on behalf of a putative class against Defendants on May 5, 2026. (Doc. 1). Clark alleges that Defendants violated the privacy of visitors to Health Net's website, www.healthnet.com, by embedding tracking technologies that intercepted and shared visitors' personal information with third parties—including Meta and The Trade Desk—without proper consent and despite visitors using the website's cookie banner to decline non-essential cookies.  (*See generally id.*).  Clark asserts claims under the Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code § 502); the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); the California Consumer Privacy Act (Cal. Civ. Code §§ 1798.100, *et seq.*); the California Invasion of Privacy Act (Cal. Penal Code §§ 631, 632, and 638.51); the Electronic Communications Privacy Act (18 U.S.C. §§ 2511(1) and 2511(3)(a)); and common law theories of negligence, negligence per se, breach of express and implied contract, unjust enrichment, breach of fiduciary duty, breach of confidence, and declaratory judgment. (*Id.*).

Clark seeks to represent a nationwide class of all individuals in the United States who clicked "Decline" on Health Net's cookie banner and whose information was allegedly disclosed by Health Net to third parties through Health Net's website's

tracking technology without authorization, and a California subclass of all California citizens within the same definition.  (*Id.* at ¶ 130).

## II.    <u>THE SHANNON ACTION</u>

The plaintiffs in the *Shannon* Action filed a putative class action against Health Net on April 9, 2026.  (Shannon Action, ECF 1).  Health Net filed a motion to dismiss the Complaint on June 11, 2026.  (*Id.* at ECF 22).  On July 28, 2026, the Court granted Health Net's Motion to Dismiss with leave to amend.  (*Id.* at ECF 33).  Plaintiffs filed an Amended Class Action Complaint on August 7, 2026.  (*Id.* at ECF 34).  Defendant Health Net's deadline to respond to the amended complaint is August 17, 2026.  (*See id.* at ECF 33).  On July 20, 2026, the Court set a case schedule and a trial date.  (ECF 30.)

The plaintiffs in the Shannon Action allege that Health Net violated the privacy of visitors to its website, www.healthnet.com, by deploying tracking technologies that intercepted and transmitted visitors' personal information to third parties—including Meta and The Trade Desk—despite visitors using the website's cookie banner to decline non-essential cookies. (Shannon Action, Doc. 34).  The Shannon plaintiffs assert claims under the federal Wiretap Act (18 U.S.C. § 2510, *et seq.*); the California Invasion of Privacy Act (Cal. Penal Code §§ 631 and 638.51); the California Consumer Legal Remedies Act (Cal. Civ. Code § 1770, *et seq.*); the California Constitution (Art. I, § 1) for invasion of privacy; the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*); and common law theories of invasion of privacy/intrusion upon seclusion, fraud/deceit/misrepresentation, and unjust enrichment.  (*Id.*).

As to the Wiretap Act and the common law theories of invasion of privacy, fraud/deceit/misrepresentation, and unjust enrichment, the named plaintiffs in the Shannon Action seek to represent a nationwide class of all natural persons in the United States who visited and interacted with Health Net's website during the applicable limitations period whose electronic information was purportedly disclosed through

tracking technology.  (*Id.* at ¶ 151).  As for the remaining causes of action, the named plaintiffs in the Shannon Action seek to represent a California subclass of all natural persons who visited or interacted with Health Net's website while located in the State of California within the same definition. (*Id.* at ¶ 152).  Though the Shannon Action's proposed class definitions are not limited to individuals who declined non-essential cookies while using Health Net's website, the named plaintiffs claim that they did so. (*See id.* at ¶¶ 10, 15–16).

## III.    THIS ACTION AND THE SHANNON ACTION ASSERT VIRTUALLY IDENTICAL CLAIMS

The Shannon Action and this class action both allege the same subject matter regarding Health Net's website and assert overlapping causes of action. Both actions name Health Net as a defendant and challenge the same alleged conduct: Health Net's deployment of tracking technologies on its website, www.healthnet.com, that purportedly intercepted and shared visitors' alleged sensitive information with third-party advertising entities (including Meta and The Trade Desk) after visitors declined non-essential cookies through the website's cookie banner. The actions also assert overlapping causes of action, including claims under the federal Electronic Communications Privacy Act/Wiretap Act (18 U.S.C. § 2510, *et seq.*), the California Invasion of Privacy Act (Cal. Penal Code §§ 631 and 638.51), and the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*).  While each action also asserts a handful of causes of action that the other does not, all of the claims in both actions are based on the same core allegations regarding Health Net's website's tracking technology.  And while Clark has also named Health Net's parent company, Centene, as a defendant, he has not alleged any claims against Centene separate and apart from the claims against Health Net.  (*See* Doc. 1 at ¶¶ 27–29).

Moreover, both actions are also putative class actions with overlapping proposed class definitions. This action defines its proposed nationwide class and California

subclass as all individuals in the United States and all citizens of California, respectively, who clicked "Decline" on Health Net's cookie banner and whose information was disclosed to third parties through Health Net's website's tracking technology without authorization. (Doc. 1 at ¶ 130). The Shannon Action defines its proposed nationwide class and California subclass as all natural persons in the United States and in California, respectively, who visited Health Net's website and whose electronic communications were intercepted, disclosed, or shared via the website's tracking technology. (Shannon Action, Doc. 34 at ¶¶ 151–52). While the class definitions in this action are slightly more specific, they are included within the scope of the Shannon Action's class definitions. Indeed, based on each plaintiff's own allegations in each complaint, the named plaintiff in this action would also fall within the proposed class in the Shannon Action.

## IV. THIS ACTION SHOULD BE CONSOLIDATED WITH THE SHANNON ACTION

This action should be consolidated with the Shannon Action now that this action has been transferred to the United States District Court for the Central District of California. (Doc. 21). As it stands, this Court and Judge Gary Klausner, who is currently presiding over the Shannon Action, are faced with the same factual allegations against the same entity in the context of many of the same statutory and common law causes of action. These separate actions present a substantial risk of conflicting decisions impacting both Health Net—whose website is at issue in both actions—as well as the named plaintiffs in both actions—who all fall within the class definitions in the Shannon Action. Moreover, at the time of this filing, there has been no responsive pleading filed in this action, nor has there been any discovery or motion practice in this action. Accordingly, now that this action has been transferred to the Central District of California, these matters should be deemed related pursuant to Local

Rule 83-1.3, and this action should be consolidated with the Shannon Action pursuant to Federal Rules of Civil Procedure Rule 42.  *See* Fed. R. Civ. P. 42(a)(2).

DATED:  August 13, 2026                    MAYNARD NEXSEN LLP


By: */s/ Charles K. Chineduh*
    Charles K. Chineduh

    Attorney for Defendants
    CENTENE CORPORATION and
    HEALTH NET, LLC

DEFENDANTS' NOTICE OF RELATED CASE
Case No. 2:26-cv-8955-MCS-DMK

# EXHIBIT A

Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore Maya (SBN 223242)
tmaya@ahdootwolfson.com
Yufei Wang (SBN 346170)
ywang@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

Mark H. Jensen*
mjensen@zlk.com
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*admitted *pro hac vice*

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE SHANNON and REBEKKA LIEN, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>v.<br><br>HEALTH NET, LLC<br><br>              Defendant. | Case No. 2:26-cv-03814-RGK-E<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

---

Steve Shannon and Rebekka Lien ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Amended Class Action Complaint against Defendant Health Net, LLC ("Defendant" or "Health Net"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## **NATURE OF THE ACTION**

1. In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2. Health Net operates a commercial website, https://www.healthnet.com/content/healthnet/en_us.html (the "Website"), through which users can browse and enroll in health insurance plans; access information regarding coverage options, benefits, and provider networks; locate and interact with healthcare providers and facilities; manage their member accounts; review claims, billing, and payment information; obtain customer support; and explore wellness programs, resources, and promotional offerings related to healthcare services. Like many modern websites, the Website displays a cookie banner (the "Cookie Banner") and a "cookie preferences" interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.

AMENDED CLASS ACTION COMPLAINT

This website uses cookies to ensure you get the best experience on our website.

Decline   Accept    Cookie Preferences

## Your Cookie Preferences  ✕

We use different types of cookies to optimize your experience on our website. Click on the categories below to learn more about their purpose. You may choose which types of cookies to allow and can change your preferences at any time. Remember that disabling cookies may affect your experience on the website. You can learn more about how we use cookies by visiting our Cookie Policy.

| | |
|---|---|
| ✓ **Essential** | **Essential** — Always active ⬤ |
| ✓ Advertising | |
| ✓ Analytics & Customization | |
| ✓ Performance & Functionality | |

These cookies are essential to support core site functionality such as providing secure log-in.

- Enables storage related to security, such as authentication functionality and fraud prevention, and other user protection.

**FIRST PARTY COOKIE PROVIDERS**
First-party cookies are set by the website that the user visits, i.e. the host domain. Websites use first-party cookies usually for, amongst other purposes, tracking visitors' behavior on the site and personalizing their browsing experience online.

**Adobe**  ⌄

https://www.adobe.com/privacy/policy.html



- 2 -

AMENDED CLASS ACTION COMPLAINT



*Figure 1 – Cookie Banner and Cookie Settings of Health Net, representing that users could change tracking behavior through Cookie Settings*

3. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website, before they can interact with the Cookie Banner.

4. The Cookie Banner misled users into believing that their data would only be shared when they actively interacted with the Website.

5. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. Upon information and belief, this data includes webpages and products viewed or purchased; inferred interests, preferences, age,

AMENDED CLASS ACTION COMPLAINT

location, or other characteristics based on user behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Website.

6. The Website offers users the ability to disable non-essential cookies by: (1) managing consent for individual categories of cookies in the Cookie Settings; and (2) clicking the "Decline" button in the Cookie Settings. Each of these actions has the same effect: to limit the Website's use of cookies to those essential for the Website to function.

7. However, even after users affirmatively reject all non-essential cookies, regardless of which mechanism is utilized to achieve that goal, the Website continues to utilize and deploy Tracking Tools, which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools (the "Tracking Entities").

8. Misrepresenting the effectiveness of a cookie opt-out mechanism and a user's ability to opt out of the sale/sharing of their personal data effectively deprives users of control over their Sensitive Information.

9. In short, because Defendant lulls users into a false sense of security, privacy, and control, while simultaneously enabling Tracking Entities to monitor, intercept, and transmit their online behavior in real time, Defendant violates users' fundamental privacy protections.

10. Plaintiffs' experiences reflect the conduct described above. As described in more detail below, Plaintiffs are California residents who visited Defendant's Website in or about 2026 for ordinary consumer purposes, including browsing information regarding Defendant's services and otherwise navigating the Website's content. While accessing the Website from California, Plaintiffs encountered the Cookie Banner and

related Cookie Settings and affirmatively rejected non-essential cookies in reliance on Defendant's representations that marketing and tracking technologies would be disabled upon rejection. Despite these actions and expectations, Defendant deployed Tracking Tools that automatically intercepted, recorded, and transmitted Plaintiff Shannon's Sensitive Information to Tracking Entities, including but not limited to Meta Platforms, Inc. ("Meta") (formerly Facebook, Inc.) and The Trade Desk. Plaintiffs reasonably relied on Defendant's representations regarding cookie controls and privacy protections, yet their Sensitive Information was nonetheless collected and shared without valid consent.

11.     Defendant invaded Plaintiffs' fundamental right to privacy and fraudulently misrepresented the Website's data-collection practices by facilitating the Tracking Entities' unlawful interception of and intrusion into Plaintiffs' Sensitive Information. In doing so, Defendant violated the federal Wiretap Act ("Wiretap Act"), 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device); California's Consumer Legal Remedies Act ("CLRA"), Cal. Civil Code § 1750, et seq.; the California Constitution at Cal. Const., Art. I, § 1; California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2510, et seq. This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members is more than 100, and at least one member of the Class defined

- 5 -
AMENDED CLASS ACTION COMPLAINT

below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

13. This Court has personal jurisdiction over Defendant because Defendant is registered to conduct business in this District and because Defendant has expressly submitted to the jurisdiction of this Court.[1]

14. Venue is proper in this Court because Defendant conducts business in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

15. Plaintiff Steven Shannon is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Shannon accessed and used Defendant's Website while located in California. Most recently, Plaintiff Shannon visited the Website in or about January 2026 for consumer browsing purposes, including to compare insurance plans. Plaintiff Shannon does not maintain an account with Defendant and regularly declines non-essential cookies on websites as a matter of personal privacy practice. In connection with his visit to Defendant's Website, Plaintiff Shannon engaged with Defendant's Cookie Banner and Cookie Settings and declined all non-essential cookies, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Shannon reasonably believed that by rejecting non-essential cookies, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Shannon's affirmative rejection of non-essential cookies, Defendant deployed Tracking Tools that intercepted, recorded, and transmitted Plaintiff Shannon's browsing activity, device identifiers, and related metadata to the Tracking Entities, including Meta and The Trade Desk. The interception disclosed the substance of Plaintiff Shannon's communications

---

[1] *Terms of Use*, HEALTH NET, https://www.healthnet.com/content/healthnet/en_us/disclaimers/legal/terms-conditions.html (last visited Apr. 7, 2026).

AMENDED CLASS ACTION COMPLAINT

with the Website, including the pages and health-related information he chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Shannon's clear refusal of non-essential tracking technologies. As a result, Plaintiff Shannon's Sensitive Information was intercepted and recorded without his consent. Had Plaintiff Shannon known that Defendant's representations in the Cookie Banner and Cookie Settings were false, he would not have relied on Defendant's misrepresentations and would not have continued to use the Website.

16. Plaintiff Rebekka Lien is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Lien maintains an account with Defendant. Plaintiff Lien accessed and used Defendant's Website while located in California. Most recently, Plaintiff Lien visited the Website in or about March 2026 for purposes including accessing and interacting with her account and related services. While on the Website, Plaintiff Lien entered search queries related to the results of blood tests she had undergone, as well as to search for therapists and possible alternative treatment clinics. In connection with her visit to Defendant's Website, Plaintiff Lien engaged with Defendant's Cookie Banner and Cookie Settings and declined all non-essential cookies, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Lien reasonably believed that by rejecting non-essential cookies, her browsing activity and interactions would not be tracked beyond what was strictly necessary for the Website's functionality. Despite Plaintiff Lien's affirmative rejection of non-essential cookies, Defendant deployed Tracking Tools that intercepted, recorded, and transmitted Plaintiff Lien's browsing activity, account-related interactions, device identifiers, and related metadata to Tracking Entities, including Meta and The Trade Desk. The interception disclosed the substance of Plaintiff Lien's communications with the Website, including pages viewed, account-related activity, and other engagement data, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Lien's clear refusal of non-essential tracking technologies. As a result, Plaintiff Lien's Sensitive Information was intercepted and

- 7 -

AMENDED CLASS ACTION COMPLAINT

recorded without her consent. Had Plaintiff Lien known that Defendant's representations in the Cookie Banner and Cookie Settings were false, she would not have relied on Defendant's misrepresentations and would not have continued to use the Website.

17. Defendant Health Net, LLC is a for-profit limited liability company that is registered to conduct business in the State of California. Health Net provides health insurance products and related healthcare services through its website, https://www.healthnet.com/content/healthnet/en_us.html.

## FACTUAL ALLEGATIONS

### I. How Websites Function

18. Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

19. Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[2]

20. Each webpage has a unique address, and two webpages cannot be stored at the same address.[3]

21. When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[4]

---

[2] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Feb. 17, 2026).

[3] *Id.*

[4] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 17, 2026).

AMENDED CLASS ACTION COMPLAINT

22. An IP address is "a unique address that identifies a device on the Internet or a local network."[5] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

23. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[6]

24. This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

25. The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[7] as depicted below:

---

[5] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 17, 2026).

[6] *Id.*

[7] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).

AMENDED CLASS ACTION COMPLAINT

Figure 2 – Mozilla's diagram of a URL, including parameters[8]

26.    Website owners or web developers write and manage the URLs for their websites.

27.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[9] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

28.    The American Standard Code for Information Interchange ("ASCII") was designed in the early 1960s as a standard character set for computers and electronic devices.[10] Today, UTF-8 is the Internet's most common character encoding.[11]

29.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[12] To demonstrate:



Figure 3 – Demonstrating URL encoding and decoding[13]

---

[8]    *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 17, 2026).

[9] *Id.*

[10]    *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Feb. 17, 2026).

[11] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Feb. 17, 2026).

[12] *What Is URL Decoding and URL Encoding?*, GOCHYU (last modified Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Feb. 17, 2026).

[13] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Feb. 17, 2026).

- 10 -

30.     Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.



*Figure 4 – Sample webpage used to demonstrate a webpage URL*



*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 6)*

AMENDED CLASS ACTION COMPLAINT

*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

31. After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser, as it arrives,[14] and rendered into a visual display according to the instructions of the HTML code.[15] This is the visible, and usually interactable, website that most people think of.

32. To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[16]

33. Such complex tasks include code used to monitor and report user activity.

---

[14] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[15] *What Is a URL?*, MOZILLA, (last visited Feb. 17, 2026).

[16] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

- 12 -

AMENDED CLASS ACTION COMPLAINT

34. In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, and when and how they do it, and with what software and hardware.

35. Unbeknownst to users, as they browse the Website, the Tracking Tools, including third-party and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

**II. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookies and Tracking Tools**

36. Defendant voluntarily procured and integrated Tracking Tools from various Tracking Entities into its Website's programming. Defendant's use of such tools on its Website is carried out pursuant to commercial agreements between Defendant and third parties, including the Tracking Entities.

37. The Website causes users' devices to store and/or transmit both first and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, or even hover over.

38. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

39. Third-party cookies are placed by domains other than the Website's domain, such as facebook.com and other advertising or analytics domains. When a user's

- 13 -

AMENDED CLASS ACTION COMPLAINT

browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

40.     As detailed further below, Tracking Tools, including first-party and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

41.     Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, the Tracking Tools enable Defendant and the Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as that Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

42.     Defendant owns and operates the Website, which allows users to browse and enroll in health insurance plans, access information regarding coverage options, benefits, and provider networks, locate healthcare providers, obtain customer support, and create and manage user accounts. When users interact with the Website by navigating pages, clicking links, entering data, or ordering Health Net's products, they communicate directly with Defendant.

43.     Defendant chooses to place the Tracking Tools on the Website such that when users visit the Website, both first-party and third-party cookies are placed on users' devices and/or are monitored for and those cookies are transmitted to Tracking Entities,

- 14 -

AMENDED CLASS ACTION COMPLAINT

combined with parameters, metadata, and detailed Request URLs. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

44. The Cookie Settings state that users can manage their cookie preferences by rejecting some or all cookies that are not essential

45. The Cookie Settings further represent that "Essential Cookies" are used across the Website to function, cannot be switched off, and do not store any personally identifiable information:

**Essential Cookies**

These cookies are essential to support core site functionality such as providing secure log-in. Enables storage related to security, such as authentication functionality and fraud prevention, and other user protection.

46. The Cookie Settings further represent that "Advertising Cookies" are used to help serve advertising that is relevant and personalized for users.

**Advertising Cookies**

These cookies help serve advertising content that is relevant to you. Sets consent for personalized advertising. Enables storage, such as cookies, related to advertising. Sets consent for sending user data to Google for online advertising purposes.

47. The Cookie Settings further represent that "Analytics & Customization" are used across the Website for site optimization:

**Analytics & Customization Cookies**

These cookies analyze usage for site optimization. Enables storage, such as cookies, related to analytics (for example, visit duration).

48. The Cookie Settings further represent that "Performance & Functionality" is used for an enhanced browsing experience:

- 15 -

AMENDED CLASS ACTION COMPLAINT

**Performance & Functionality Cookies**

These cookies facilitate measurement and analytics for improved browsing experience. Enables storage that supports the functionality of the website or app, such as language settings. Enables storage related to personalization, such as video recommendations.

49. Defendant's Cookie Settings clearly inform users that their Sensitive Information and communications with the Website will not be intercepted and transmitted to the Tracking Entities through the use of cookies if they choose to reject all non-essential cookies.

## III. The Website's Cookie Banner Misled Users

50. When users in locations such as California visited the Website, the Website immediately displayed the Cookie Banner. The Cookie Banner informed users of the Website that:

> The Website uses cookies to ensure you get the best experience on our website.[17]

51. The Cookie Banner further presented users with a button to "Decline," a button to "Accept," and a "Cookie Preferences" option. The Cookie Banner further presented users with the ability to manage preferences through the "Cookie Preferences" link. Upon selecting "Accept" or dismissing the banner, it disappears.



*Figure 7 – The Cookie Banner shown to users who visit the Website*

52. Website users who selected the "Cookie Preferences" option were presented with the Cookie Settings, which allowed users to manage their consent preferences by enabling or disabling certain categories of cookies, including "Advertising," "Analytics & Customization," and "Performance & Functionality."

---

[17] The Cookie Banner as it appeared on the Website as of Apr. 7, 2026.

AMENDED CLASS ACTION COMPLAINT

53. Defendant represented to users, in substance, that they could exercise their right to decline the use of non-essential cookies, and if they declined the cookies, Defendant would not provide personalized advertising and would not expose users' personal information to third parties. Specifically, Defendant informed users: "We use different types of cookies to optimize your experience on our website. Click on the categories below to learn more about their purpose. You may choose which types of cookies to allow and can change your preferences at any time. Remember that disabling cookies may affect your experience on the website. You can learn more about how we use cookies by visiting our Cookie Policy." Defendant's offer was not only to discontinue disclosures through cookies, but a blanket discontinuation of the sale or disclosure of personal information to Tracking Entities.



AMENDED CLASS ACTION COMPLAINT

*Figure 8 – Cookie Settings representing users with an option of rejecting non-essential cookies*

54.     After users selected "Decline" or otherwise adjusted their cookie preferences and clicked "Save Changes," users were permitted to continue browsing the Website. At that point, the Cookie Settings window disappeared.

55.     Defendant's Cookie Banner and Cookie Settings led Plaintiffs, and all Website users similarly situated, to believe that they had successfully disabled all non-essential cookies. The Cookie Banner and Cookie Settings further reasonably led Plaintiffs and all reasonable users to believe that Defendant would not allow the Tracking Entities to access their Sensitive Information. Plaintiffs acted on those representations by interacting with the Website after making privacy selections intended to prevent the use of non-essential cookies.

56.     These representations were false. In reality, Defendant did not abide by Plaintiffs' and other users' expressed preferences. When users chose to disable the sharing of their Sensitive Information and to decline all non-essential cookies, they clearly communicated that they did not consent to the Website's placement or transmission of the Tracking Tools, including non-essential cookies. Nevertheless, Defendant allowed the Tracking Tools, including cookies, to be placed on or accessed

- 18 -

AMENDED CLASS ACTION COMPLAINT

from users' browsers and devices, enabling the Tracking Entities to intercept, transmit, and use users' Sensitive Information in real time.

57. The Tracking Tools function as an unlawful wiretap, pen register, and trap and trace device when executed because they enable Tracking Entities, separate and distinct parties from Defendant, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. The Tracking Entities are not mere passive tools or instruments of Defendant; they collect, analyze, and use the intercepted communications for their own commercial purposes, as well as for Defendant's own commercial purposes.

## IV. Defendant's Website Uses Tracking Tools to Spy on Users

58. Defendant operates the Website and installed Tracking Tools created by the Tracking Entities. These Tracking Tools operate surreptitiously, tracking Website users' activity by intercepting users' Sensitive Information as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

59. The Tracking Tools collect information about users' site activity when Defendant-designated events, such as adding a product to a shopping cart or loading a particular webpage, occur. Defendant also configures the parameters for those events, determining both how much data the Tracking Tools collect and how specific that data is.

60. Parameters are strings of text that website owners add to a URL to track and organize their webpages.[18] URL parameters include key-value pairs formatted as "key=value."

  a. The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

---

[18] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026) https://backlinko.com/url-parameters (last visited Feb. 17, 2026).

AMENDED CLASS ACTION COMPLAINT

b. The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 9 – Diagram of a URL displaying how parameters function*[19]

### A. The Meta Pixel

61. Meta offers its own tracking pixel known as the Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Meta.

62. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Meta Pixel.[20]

63. Upon creating a Meta Pixel, a pixel ID (also called a DataSet ID by Meta), is generated.[21] This pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a pre-determined library of code related to that ID, or otherwise by identifying

---

[19] *Id.*

[20] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Feb. 5, 2026).

[21] *Id.*

- 20 -

AMENDED CLASS ACTION COMPLAINT

the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[22]

64. This pixel ID must match "a known Pixel ID" in Meta's system,[23] and is transmitted by the Meta Pixel.[24]

65. As Meta notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[25]

66. The Meta Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[26] Receiving this information enables Meta and Defendant to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[27]

67. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[28]

68. Once implemented on a website, the Meta Pixel begins to share users' information the moment a user lands on the website.

---

[22] *Get Started*, FACEBOOK, (last visited Feb. 5, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[23] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Feb. 5, 2026).

[24] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 5, 2026).

[25] *Get Started*, FACEBOOK, (last visited Feb. 5, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[26] The Meta Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, (last visited Feb. 5, 2026).

[27] *See Meta Pixel_ Unlock smarter advertising with insights from your website.*, FACEBOOK, (last visited Feb. 5, 2026).

[28] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 5, 2026).

AMENDED CLASS ACTION COMPLAINT

69. When a Facebook account holder logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[29] These cookies allow Meta to link the data it receives through the Meta Pixel to individual Facebook account holders.

70. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

*Figure 10 – Sample c_user cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Facebook Pixel*

71. The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 10*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below:

---

[29] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Feb. 5, 2026).

- 22 -

AMENDED CLASS ACTION COMPLAINT



*Figure 11 – Sample Facebook account created by Plaintiffs' counsel to investigate the Meta Pixel, with FID highlighted in URL*

72. The Meta Pixel tracks user activity on web pages by monitoring events,[30] which, when triggered, causes the Pixel to automatically send data – here, users' Sensitive Information – directly to Facebook.[31] Examples of events utilized by websites include a user loading a page with a Pixel installed (the "PageView event");[32] The Website utilizes this PageView event.[33]

---

[30] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 5, 2026).

[31] *See generally id.*

[32] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Feb. 5, 2026).

[33] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper tool*, FACEBOOK,

AMENDED CLASS ACTION COMPLAINT

73. The Meta Pixel also transmits its unique pixel IDs via the "id" parameter, which contains Defendant's pixel IDs of "528559700815736" and "1074589766271983".

74. Defendant leverages the Meta Pixel to monetize its Website users' Sensitive Information.

75. Meta independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

76. Defendant's use of the Meta Pixel on the Website is demonstrated by the screenshots below, which follow a user's viewing a webpage on the Website.



https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Feb. 5, 2026).

AMENDED CLASS ACTION COMPLAINT





*Figure 12 – Facebook Pixel tracking a user landing on the webpage from Figure 4 through the "PageView" event*

77. When a business applies with Meta to use the Meta Pixel, it is provided with details about the Meta Pixel's functionality, including its ability to access private information.[34]

_____

[34] *See Get Started*, META (last visited Feb. 5, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

- 25 -

AMENDED CLASS ACTION COMPLAINT

78.     To make use of the Meta Pixel, Defendant agreed to Meta's Business Tool Terms (the "Meta Terms").

79.     The Meta Terms inform website owners using Meta's Pixel that the employment of the Pixel will result in data sharing, including with Meta, through the automatic sharing of Pixel Event information and contact information.[35]

80.     The Meta Terms are transparent that Meta will use the Meta Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[36]

81.     Meta directs parties implementing the Meta Pixel—here, Defendant—to encrypt request information[37] *before* data can be shared.[38]

82.     Meta further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Meta.

83.     Meta educates or reminds website owners, who install the Meta Pixel, that it is their responsibility to inform users of their website's data sharing practices, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third party.[39]

84.     As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that

---

[35] *Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 5, 2026).

[36] *Id.*

[37] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See id.*

[38] *Id.*

[39] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Feb. 5, 2026).

- 26 -

AMENDED CLASS ACTION COMPLAINT

would result from use of the Meta Pixel and ignored Meta's warnings to safely handle its users' data and to sufficiently and accurately position to users that the Website would disclose information in a manner that threatened users' private information.

## B. The Trade Desk Pixel

85.  The Trade Desk is a demand-side platform ("DSP"), meaning it provides automation software to assist advertisers in purchasing advertisements.[40]

86.  The Trade Desk ("Trade Desk") provides advertisement purchasers with software tools to manage, analyze, and optimize digital advertising campaigns across multiple channels and inventory sources.[41] Trade Desk works with supply-side platforms ("SSPs"), which are used to manage the supply of advertising inventory for publishers and other entities that sell advertising space on their websites.[42] Trade Desk is integrated with many supply-side platforms that rely on advertising spend generated by advertisers using Trade Desk.[43]

87.  With respect to personalized advertisements delivered to users, Jeff Green, Chief Executive Officer of Trade Desk, described the company's Unified ID 2.0 marketing technology as follows: "[W]e will have effectively solved the identity-matching challenge of the entire open internet on a scale well beyond anything cookies have ever accomplished, and all while providing consumers with much greater control over their privacy."[44]

---

[40] *What is a demand-side platform (DSP)*, ADJUST, https://www.adjust.com/glossary/demand-side-platform/ (last visited Feb. 5, 2026).

[41] *Trackers: The Trade Desk (adsrvr.org)*, BETTER.FYI, https://better.fyi/trackers/adsrvr.org/ (last visited Feb. 5, 2026).

[42] *What is a Supply-Side Platform?*, PUBLIFT, https://www.publift.com/adteach/what-is-a-supply-side-platform (last visited Feb. 5, 2026).

[43] *Id.*

[44] Chris Kelly, *Trade Desk revenue up 24% as advertisers continue shift to CTV, retail media*, MARKETINGDIVE (Feb. 15, 2023) https://www.marketingdive.com/news/trade-desk-earnings-q4-ctv-retail-media/642825/ (last visited Feb. 5, 2026).

- 27 -

AMENDED CLASS ACTION COMPLAINT

88. Among the tracking technologies offered by Trade Desk, and employed by the Website for tracking user behavior and collecting data for targeted advertising, is the Trade Desk Universal Pixel ("TTD Pixel").[45] The TTD Pixel is enabled by placing TTD Pixel code within a website's code, which enables the capture of data on each page of the website and across multiple websites.[46] The TTD Pixel is designed to collect and transmit user data that marketers use to measure, manage, and optimize programmatic advertising campaigns.[47]

89. The TTD Pixel, like other pixels, is a tracking tool that can be integrated with Trade Desk's platform (the "Platform").[48] The TTD Pixel allows advertisers and site operators to "spend less time placing tags, gain more visibility into user data, and analyze reporting at a more granular level . . . all with the placement of a single tag."[49] The TTD Pixel collects information including demographics, browsing behavior, and

---

[45] *The Trade Desk Universal Pixel*, TEALIUM, https://tealium.com/integrations/the-trade-desk-universal-pixel/ (last visited Feb. 5, 2026).

[46] *Universal Pixel*, THE TRADE DESK, https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited Feb. 5, 2026).

[47] Mason Widmer, *4 Vital Best Practices for Using The Trade Desk + A Top Tip*, GRAPESEED MEDIA (Nov. 6, 2024) https://grapeseedmedia.com/blog/trade-desk-best-practices/ (last visited Feb. 5, 2026).

[48] The Trade Desk platform refers to the Trade Desk's self-service technologies for buying and managing digital advertising campaigns across various channels and formats (the "Platform"). The Platform allows advertisers to use data to better target specific audiences using the TTD Pixel, along with other technologies. The Platform also provides real-time bidding, where advertisers bid on ad impressions, and can access insights into impressions, clicks, conversions, and audience engagement metrics. The Platform allows for cross-device advertising to smartphones, tablets, TVs, and desktop computers. Overall, the Platform provides advertisers with advertising capabilities, audience targeting, real-time bidding, data analytics, and control over their digital ad campaigns.

[49] *Universal Pixel*, THE TRADE DESK (last visited Feb. 5, 2026).

- 28 -

AMENDED CLASS ACTION COMPLAINT

conversion events. The precise categories of information collected through the TTD Pixel in this case are described in further detail below.[50]

90.     The TTD Pixel is not limited to computer or browser-based browsing; it is capable of collecting information from mobile platforms, including how a user interacts with mobile applications, and specific details regarding the mobile device being used to access the content and the applications.[51]

91.     An advertiser or website operator that uses the Platform to run campaigns can leverage the TTD Pixel to collect data regarding how users interact across websites, mobile applications, television, and other technologies.[52]

92.     Integration of the TTD Pixel by Defendant provides benefits to Trade Desk and the Website, as discussed below.

93.     The first benefit provided by the TTD Pixel to Trade Desk is data collection. This data allows Trade Desk to segment user information to create target audiences and track conversions.[53] For example, the TTD Pixel enables Trade Desk to collect user data, including demographic information, browsing behavior, preferences, and interactions with websites.[54] This data is then sent to an SSP, which analyzes bids from multiple DSP, such as Trade Desk, and facilitates the targeting of users based on their information.[55] Trade Desk relies on this information for its business operations.

---

[50] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Feb. 5, 2026).

[51] *Privacy and The Trade Desk Platform*, THE TRADE DESK, https://www.thetradedesk.com/us/privacy (last visited Feb. 5, 2026).

[52] *Id.*

[53] *What are Pixels and Why Do I Need to Use Them?*, AX Insights (Sept. 3, 2020) (last visited Feb. 5, 2026).

[54] Andy Pitre, *Ad Tracking: What It Is & How to Do It*, HubSpot: Blog (Mar. 10, 2022) https://blog.hubspot.com/blog/tabid/6307/bid/7249/a-marketer-s-guide-to-tracking-online-campaigns.aspx (last visited Feb. 5, 2026).

[55] *Programmatic Advertising: Your Guide to DMPs, DSPs, and SSPs*, GROWTH MARKETING GENIE, https://growthmarketinggenie.com/blog/programmatic-advertising-dmps-dsps-ssps/ (last visited Feb. 5, 2026).

- 29 -

AMENDED CLASS ACTION COMPLAINT

94.     The TTD Pixel also enables Trade Desk to retarget users by creating lookalike audiences, as the TTD Pixel is "essentially [] just storing a group of people and information about them."[56] A lookalike audience is a group of individuals who are likely to be interested in a business because they share similarities with the business's existing customers.[57] By developing lookalike audiences, Trade Desk enhances its ability to bid for advertising space from SSPs by identifying website users who are more likely to generate clicks or conversions based on shared characteristics with existing customers.[58]

95.     Finally, because Trade Desk's primary business model involves charging clients or advertising publishers a percentage of gross spending on the Trade Desk platform, improvements in advertising effectiveness increase Trade Desk's revenue. When advertising targeting efficiency improves by increasing advertising conversion rates (the rate at which clicks turn to sales),[59] advertisers are more likely to shift additional business to Trade Desk, resulting in increased revenue derived from ad sales.[60]

96.     On the Website, the TTD Pixel is configured to intercept a user's browsing and website information, thereby capturing the contents of the user's search communications in transit:[61]

---

[56] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) (last visited Feb. 5, 2026).

[57] *Facebook Lookalike Audiences & When to Use Them*, BLACKBOX, https://blackboxdms.com/leveraging-your-data-how-to-build-facebook-lookalike-audiences-when-to-use-them/ (last visited Dec. 23, 2025).

[58] *Id.*

[59] *What is a conversion rate (CVR)?*, ADJUST, https://www.adjust.com/glossary/conversion-rate/ (last visited Feb. 5, 2026).

[60] Trevor Jennewine, *How Does The Trade Desk Make Money?*, THE MOTLEY FOOL (Oct. 27, 2021 7:35 am EDT) https://www.nasdaq.com/articles/how-does-the-trade-desk-make-money-2021-10-27 (last visited Feb. 5, 2026).

[61] Here, a test search was made using "Medi-cal" as the Search Terms.

AMENDED CLASS ACTION COMPLAINT

*Figure 13 – Inputting Search Terms into the Search Bar results in TTD Pixel Intercepting the Search Terms*

## V. The Sensitive Information Intercepted, Transmitted, and Used by the Tracking Entities Is Private and Protected

97.     The Sensitive Information intercepted by the Tracking Tools and transmitted to the Tracking Entities includes users' private and confidential information, which includes the pages they viewed and the buttons they clicked; keyword searches; status as insured individuals; and identifying information, including IP addresses and identifying cookies.

98.     For instance, users such as Plaintiffs can use the Website's provider directory to search for medical professionals. When users conduct this type of search, the Website shares users' search details with the Tracking Entities, revealing visitors' health conditions and concerns.

99.     Similarly, when a user searches for keywords, such as "blood test results," or "therapist," the Tracking Tools transmit events disclosing that the patient searched for the keywords, namely "searchTerm=bloodtestresults" and/or "searchTerm=therapist" with the Tracking Entities.

100.    When a user visits specific pages on the Website, for example, the "Maternity & Family Planning" page, the Website transmits events disclosing that the user visited that page to the Tracking Entities.

101.    Users can visit the Website to manage their insurance; activities customers may perform include logging in, creating a new login, and paying their bill. As the user performs any of these activities, the Website transmits these events to the Tracking Entities.

102.    In all cases, including the examples discussed above, the Sensitive Information intercepted includes both a cookie unique to the individual's browser and

- 31 -
AMENDED CLASS ACTION COMPLAINT

an IP address. Both of these data points separately enable unique identification of a specific individual.

103. The Sensitive Information allows the Tracking Entities to establish that a particular individual is seeking medical care, uses specific prescription drugs, suffers from a specific condition, lives in a specific geographic location, and is either insured or uninsured. Defendant's facilitation of these unauthorized disclosures, via the Tracking Tools, engenders a variety of harmful consequences, including social stigma, higher insurance rates, familial stress, and loss of trust in healthcare providers, leading to underdiagnosis and treatment.

104. The Sensitive Information includes both Protected Health Information ("PHI")[62] and Personally Identifying Information ("PII")[63] linking the Disclosed Information to a specific visitor. The Sensitive Information includes browser-specific cookie IDs unique to each visitor ("Unique ID Cookies"), as well as each visitor's IP address.

---

[62] Under the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d, et seq., and its implementing regulations, "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. *See* 45 C.F.R. § 160.103. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information." *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws- regulations/index.html (last accessed August 6, 2026).

[63] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person." 17 C.F.R. § 248.201(b)(8).

AMENDED CLASS ACTION COMPLAINT

## VI. Defendant and the Tracking Entities Profit from the Unauthorized Disclosure of Users' Sensitive Information, Which Includes Private Health Information

105. On information and belief, the Tracking Entities derive profit from users' Sensitive Information through one or more of the following mechanisms: (1) building individualized profiles about visitors' interests and selling targeted advertising; (2) selling the Sensitive Information, possibly aggregated with additional information gleaned from other sources, to other third parties; and (3) providing analytics and other services in exchange for a subscription fee or other payment.

106. Data harvesting is highly profitable. As one court recently held, "[the Defendant] cannot seriously dispute that browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. As [the plaintiff's expert] explained, there is an entire 'data industry,' and estimates suggest that that industry 'now generates combined annual revenues of approximately $300 billion dollars.'" *John Doe, et al. v. Virginia Mason Medical Center*, No. 19- 2-26674-1 SEA, 2024 WL 3517759 (Wash. Sup. Ct., June 6, 2024).

107. Health data is particularly valuable. The collection and sale of consumer health data is both highly lucrative and represents unique risks to consumer privacy.[64] As CNBC reported in 2019, "patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[65]

---

[64] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME, https://time.com/4588104/medical-data-industry/.

[65] *See* Christina Farr, *Hospital Execs Say They are Getting Flooded with Requests for Your Health Data*, CNBC, https://www.cnbc.com/2019/12/18/hospital-execs-saytheyre-flooded-with-requests-for-your-health-data.html.

AMENDED CLASS ACTION COMPLAINT

## VII. Defendant's Conduct Violated Several Promulgated Standards of Conduct

### A. Defendant's Conduct Violated HIPAA Standards

108. Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

109. Recognizing these facts, and in order to implement the requirements of the HIPAA, the United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect private information, as the Sensitive Information Plaintiffs communicated to the Website.

110. Under HIPAA, a healthcare provider may not disclose personally identifiable, nonpublic medical information (PHI) about a patient, a potential patient, or a household member of a patient for marketing purposes without the patient's express written authorization.[66]

111. HHS guidance instructs healthcare providers that patient status alone is protected by HIPAA.

112. With respect to methods for de-identification of PHI in accordance with the HIPAA Privacy Rule, HHS instructs

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance,

---

[66] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 164.508(a)(3), and 164.514(b)(2)(i).

- 34 -

AMENDED CLASS ACTION COMPLAINT

if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[67]

113.   In its guidance for marketing, HHS further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or him protected health information can be made for marketing….Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.[68]

114.   In addition, in December 2022, the Office for Civil Rights (OCR) at the DHSS issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology[69] (the "December 2022 Bulletin"[70]).

---

[67] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/Deidentification/hhs_deid_guidance.pdf.

[68] *Marketing*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[69] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

[70] *See* archived version of the December 2022 Bulletin at HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information, HHS.gov (Dec. 1, 2022),

- 35 -

AMENDED CLASS ACTION COMPLAINT

115. Therein, HHS defined "tracking technologies," explaining:

> Tracking technologies are used to collect and analyze information about how users interact with regulated entities' website or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.[71]

116. In the Bulletin, HHS was clear and unambiguous in stating that, "[r]egulated entities are not permitted to use Tracking Technologies in a manner that would result in impermissible disclosures of PHI to Tracking Technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to Tracking Technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[72]

117. On March 18, 2024, HHS updated its December 2022 Bulletin, "to increase clarity for regulated entities and the public" and reiterating the above basic privacy obligations.[73] [74]

118. Citing The Markup's June 2022 article, the Bulletin expressly notes:

---

https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 30, 2024).

[71] *Id.*

[72] *Id.* (citing to 45 CFR 164.508(a)(3); *see also* 45 CFR 164.501 (definition of "Marketing")).

[73] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH AND HUMAN SVCS. Office for Civil Rights, (Dec. 1, 2022, updated Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html.

[74] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.*, Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," but acknowledged that the Proscribed Combination could be PHI in certain circumstances.

- 36 -

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

119. An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to Tracking Technology vendors, such as the Tracking Entities, because of the proliferation of Tracking Technologies collecting sensitive information, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.[75]

120. In other words, HHS has expressly stated that Defendant's conduct of implementing the Tracking Tools on the Website is a violation of HIPAA rules.

**B.      Defendant Violated FTC and HHS Standards**

121. The Federal Trade Commission ("FTC") has also recognized that implementation of Tracking Technologies poses "serious privacy and security risks" and

---

[75] *Id.*

- 37 -

AMENDED CLASS ACTION COMPLAINT

"impermissibly disclos[e] consumers' sensitive personal health information to third parties."[76]

122. The OCR and the FTC warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites such as Defendant's Website, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[77] OCR and FTC agree that such Tracking Technologies, like those present on Defendant's Website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[78] OCR and FTC warn that:

> Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information, including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.[79]

123. On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[80]

---

[76] *Re: Use of Online Tracking Technologies*, U.S. DEP'T OF HEALTH & HUMAN SERVICES, (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-PartyTrackers-07-20-2023.pdf.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, FEDERAL TRADE COMMISSION (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-

- 38 -

AMENDED CLASS ACTION COMPLAINT

124. Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use Tracking Technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[81] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a Tracking Technology for any marketing purposes."[82]

125. Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id.* According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, including sharing of covered information without an individual's authorization, triggers notification obligations under the Rule."[83]

126. Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[84]

---

hospital-systemstelehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[81] *Id.*

[82] *Id.*

[83] *Statement of the Commission: On Breaches by Health Apps and Other Connected Devices*, U.S. FED. TRADE COMMISSION, (Sept. 15, 2021), https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_com mission_on_breaches_by_health_apps_and_other_connected_devices.pdf.

[84] *See, e.g., U.S. v. Easy Healthcare Corp.*, Case No. 1:23-cv-3107 (N.D. Ill. 2023); *In the Matter of BetterHelp, Inc.*, FTC Dkt. No. C-4796 (July 14, 2023); *U.S. v. GoodRx*

127. As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

128. On March 18, 2024, HHS updated its December 2022 bulletin in the "March 2024 Bulletin," expanding the circumstances in which HHS would consider information from any unauthenticated website visitor to be considered PHI, and its disclosure to be a violation of HIPAA.[85] [86]

129. The March 2024 Bulletin added guidance on when the disclosure of individually identifiable health information ("IIHI") is impermissible under HIPAA, explaining that: "the mere fact that an online Tracking Technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care."[87]

130. However, in contrast, when a user visits a website related to his or her past, present, or future health, health care, or payment for health care, such as "…looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that

---

*Holdings, Inc.*, Case No. 23-cv-460 (N.D. Cal. 2023); *In the Matter of Flo Health Inc.*, FTC Dkt. No. C-4747 (June 22, 2021).

[85] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH AND HUMAN SVCS. OFFICE FOR CIVIL RIGHTS, (Dec. 1, 2022, updated Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html.

[86] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.*, Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," but acknowledged that the Proscribed Combination could be PHI in certain circumstances.

[87] *Id.*

- 40 -

webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care[,]" such that the disclosure of their information would be PHI, HIPAA rules apply, and that disclosure would be a violation of HIPAA.[88]

## C. Defendant Violated Industry Standards

131. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

132. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to Defendant and its associated physicians.

133. AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

134. AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

135. AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information

---

[88] *Id.*

electronically…must…release patient information only in keeping ethics guidelines for confidentiality.

## VIII. Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Controls

136. Plaintiffs' investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users clicked "Accept" or "Decline" on the Cookie Banner.

137. As a result, users were tracked from the moment they began using the Website, without prior consent.

138. Plaintiffs visited the Website while those default tracking settings were active.

139. Users who visit the Website are shown a Cookie Banner offering the option to configure their cookies.

This website uses cookies to ensure you get the best experience on our website.   Decline   Accept   ||| Cookie Preferences

*Figure 14 – The Cookie Banner shown to users who visit the Website*

AMENDED CLASS ACTION COMPLAINT

# Your Cookie Preferences

✕

We use different types of cookies to optimize your experience on our website. Click on the categories below to learn more about their purpose. You may choose which types of cookies to allow and can change your preferences at any time. Remember that disabling cookies may affect your experience on the website. You can learn more about how we use cookies by visiting our Cookie Policy.

✓ **Essential**

✓ **Advertising**

✓ **Analytics & Customization**

✓ **Performance & Functionality**

## Advertising

These cookies help serve advertising content that is relevant to you.

- Sets consent for personalized advertising.
- Enables storage, such as cookies, related to advertising.
- Sets consent for sending user data to Google for online advertising purposes.

**FIRST PARTY COOKIE PROVIDERS**

First-party cookies are set by the website that the user visits, i.e. the host domain. Websites use first-party cookies usually for, amongst other purposes, tracking visitors' behavior on the site and personalizing their browsing experience online.

**Meta** ⌄

https://www.facebook.com/privacy/policy

**Adobe** ⌄

https://www.adobe.com/privacy/policy.html

**Google** ⌄

https://policies.google.com/privacy

- 43 -

AMENDED CLASS ACTION COMPLAINT

**Healthnet**

https://www.healthnet.com/content/healthnet/en_us/disclaimers/legal/privacy-policy.html

**THIRD PARTY COOKIE PROVIDERS**

Third-party cookies are placed on a website by other third-party entities, and not the website itself, i.e. a domain other than the one the user sees in the address bar. Third-party cookies usually track the visitors' behavior between websites and are generally used for targeted advertising purposes.

**Adidas**

https://www.adidas.ae/en/privacy-policy.html

**Pubmatic**

https://pubmatic.com/legal/privacy/

**Adobe**

https://www.adobe.com/privacy/policy.html

**Magnite**

https://www.magnite.com/legal/magnite-website-privacy-policy/

**Google**

https://policies.google.com/privacy

**Xandr**

https://about.ads.microsoft.com/en-us/solutions/xandr/platform-privacy-policy

- 44 -

AMENDED CLASS ACTION COMPLAINT



*Figure 15 – The Cookie Settings listing all Advertising Cookies that could be rejected*

140. The Cookie Settings represented to users that cookies from Meta and Trade Desk would not be placed if users chose to decline Advertising Cookies,

141. Despite those representations, even users who declined all non-essential cookies continued to be tracked by at least Meta and Trade Desk.



*Figure 16 – The Meta Pixel tracking a user who declined all non-essential cookies*

AMENDED CLASS ACTION COMPLAINT

*Figure 17 – The Trade Desk tracking a user who declined all non-essential cookies*

142. Defendant intentionally placed Meta and Trade Desk Tracking Tools on the Website and allowed Meta and Trade Desk to place and use cookies on users' browsers, track users, and intercept their communications with the Website, despite stating in the Cookie Settings that tracking cookies would not be placed and that users' information would not be shared with Tracking Entities unless users accepted the use of cookies.

143. Representations regarding cookie-consent controls are materially misleading where tracking continues despite a website's claim to the contrary and/or users' opt-out selections.

144. Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[89]

145. The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[90]

---

[89] *See About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Feb. 17, 2026). ; *Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Feb. 17, 2026); *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Feb. 17, 2026).

[90] *See TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms(last visited Feb. 17, 2026).; *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 17, 2026).

- 46 -

AMENDED CLASS ACTION COMPLAINT

**TOLLING**

146. The statutes of limitations applicable to Plaintiffs' and the Class members' claims are tolled by Defendant's wrongful conduct and by Plaintiffs' and the Class members' delayed discovery of their claims. Defendant's acts were intentionally concealed, technically complex, and inherently self-concealing, thereby preventing Plaintiffs and the Class members from discovering the unlawful disclosure of their Sensitive Information until recently.

147. Defendant, via its Cookie Banner and Cookie Settings, misrepresented its data sharing practices.

148. Defendant possessed superior and exclusive knowledge that the Tracking Entities' Tracking Tools embedded within its Website would disclose Plaintiffs' and users' Sensitive Information.

149. Plaintiffs and the Class members could not, through the exercise of reasonable diligence or have discovered the full scope of Defendant's conduct and misrepresentations because the technology involved is highly technical and not reasonably discernible to ordinary users.

150. Plaintiffs and the Class members first became aware of Defendant's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Amended Complaint.

**CLASS ALLEGATIONS**

151. Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class and Subclass (collectively "the Class").

> All natural persons in the United States who visited and interacted with Defendant's Website during the applicable limitations period whose electronic communications were intercepted, disclosed, or shared via the Tracking Tools (the "Nationwide Class").

152. Plaintiffs bring this class action individually and on behalf of the following California Subclass:

- 47 -

> All natural persons who visited and interacted with the Defendant's Website while located in the State of California during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared via the Tracking Tools (the "California Subclass").

153. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

154. Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

155. NUMEROSITY: At this time, Plaintiffs do not know the number of Class Members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained via the records maintained by the Defendant.

156. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class Members, and which may be determined without reference to the individual circumstances of any Class Members, include but are not limited to the following:

      a.    Whether Defendant shared the Class Members with the Tracking Entities or other third parties;

      b.    Whether Defendant obtained effective and informed consent to do so;

      c.    Whether Class Members are entitled to statutory penalties; and

- 48 -

d. Whether Class Members are entitled to injunctive relief.

157. TYPICALITY: As persons who visited Defendant's Website and whose Sensitive Information was shared via acts by Defendant, Plaintiffs are asserting claims that are typical of the Class.

158. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

159. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE WIRETAP ACT
### 18 U.S.C. § 2510, et seq.
### (On Behalf of Plaintiffs and the Nationwide Class)

160. Plaintiffs incorporate the allegations in paragraphs 1–120 by reference as if fully set forth herein.

161. Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

162. The federal Wiretap Act, codified at 18 U.S.C. § 2510, et seq., prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

163. The Wiretap Act also prohibits the intentional use of the contents of any wire, oral, or electronic communication, when the person knew that the information was

- 49 -

AMENDED CLASS ACTION COMPLAINT

obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511(1). *See* 18 U.S.C. § 2511(1)(d).

164. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

165. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

166. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

167. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

168. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

169. Defendant is a "person" within the meaning of the Wiretap Act.

170. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

171. Plaintiffs have a reasonable expectation of privacy in their electronic communications with Defendant's Website, including the pages they viewed, searches conducted via the Website, browsing activity, shopping-related interactions, and other interactions with Website features, particularly where Defendant represented through their Cookie Settings that users could decline non-essential cookies.

172. The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on

AMENDED CLASS ACTION COMPLAINT

commercial websites, such as searches, browsing, and order interactions, are sensitive and convey the substance and meaning of the communication.

173. A reasonable user is entitled to assume that any disclosure of the contents of their communications occurs lawfully and with consent. To hold otherwise would require users to assume their dealings with websites are in bad faith, and users' privacy will be violated as a matter of course.

174. Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Website without their consent.

175. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were sent or received by the Tracking Tools on users' devices and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing Plaintiffs' Sensitive Information, including protected healthcare related information, and to combine that information with information collected about Plaintiffs from across the Internet to utilize for advertising, analytics, and marketing optimization.

176. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, used search or location features, viewed health insurance, placed an order, or otherwise communicated information to the Website through their browsers.

177. At all relevant times, Defendant's conduct was knowing, wilful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website, and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

178. Plaintiffs never consented to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined non-essential cookies through Defendant's cookie-preference interface.

AMENDED CLASS ACTION COMPLAINT

179. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website.

180. Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website and allowed them to intercept the communications of users on the Website, in order to subsequently disclose those communications to the Tracking Entities. Defendant falsely represented its disclosures in the Cookie Banner, and constitute an invasion of privacy.

181. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

    a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

    b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

    c.    reasonable attorneys' fees and costs.

## COUNT II
### COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the Nationwide Class)

182. Plaintiffs incorporate the allegations in paragraphs 1–120 by reference as if fully set forth herein.

183. Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

184. Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the Nationwide Class by, among other things, permitting the Tracking Tools to collect, track, and compile users' Sensitive Information while representing to users that they could opt out of such collection.

- 52 -

AMENDED CLASS ACTION COMPLAINT

185. Plaintiffs and the Nationwide Class Members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their Sensitive Information, including browsing activity, device identifiers, and related metadata, which has been recognized as Class Members.[91] Plaintiffs expected that their interactions with the Website would not be shared with the Tracking Entities.

186. Plaintiffs and the Nationwide Class Members relied on Defendant's representations and exercised the Website's opt-out controls, reasonably expecting that Defendant would honor its affirmative representation in the Cookie Banner and Cookie Settings—that users could decline the transmission and use of non-essential cookies.

187. Despite Plaintiffs' and the Nationwide Class Members' opt-outs, Defendant permitted Tracking Entities to use Tracking Tools, including cookies, to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from this data by creating detailed user profiles, audience segments, improving targeted advertising results for Defendant and Tracking Entities, and promoting Tracking Entities' business capabilities to new websites.

188. Defendant lacked any consent from users that would allow it to enable the use of Tracking Tools, including the placement and transmission of the third-party cookies and Tracking Tools, that allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, before or after receiving users' express opt-outs.

189. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Nationwide Class Members suffered injury, including but not limited to loss of privacy,

---

[91] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that colling and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

AMENDED CLASS ACTION COMPLAINT

loss of control over their personal information, diminution in value of their private data, and other compensable harms.

190. Plaintiffs and the Nationwide Class Members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracking.

**COUNT III**
**INVASION OF PRIVACY**
**AND VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of Plaintiffs and the California Subclass)**

191. Plaintiffs incorporate the allegations in paragraphs 1–120 by reference as if fully set forth herein.

192. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass Members.

193. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

194. California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative."

195. In support of Proposition 11, voters stated that:

> The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

- 54 -
AMENDED CLASS ACTION COMPLAINT

196. Plaintiffs and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications. Plaintiffs and California Subclass Members' protected interests arise from various statutes and common law, including, inter alia, the Wiretap Act, CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information."

197. The privacy rights of Plaintiffs and the California Subclass Members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiffs and the California Subclass Members.

198. Plaintiffs and the California Subclass Members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing their Sensitive Information.

199. By causing third-party cookies and Tracking Tools to be placed on users' browsers and devices and by transmitting users' Sensitive Information to Tracking Entities despite users' opt-outs, Defendant violated users' reasonable expectation of privacy.

200. Defendant's intrusion, placing Tracking Tools and enabling Tracking Entities' access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

201. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiffs and the California Subclass Members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

AMENDED CLASS ACTION COMPLAINT

## COUNT IV
### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631
### (On Behalf of Plaintiffs and the California Subclass)

202. Plaintiffs incorporate the allegations in paragraphs 1–120 by reference as if fully set forth herein.

203. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass Members.

204. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology. *See* Cal. Penal Code § 630.

205. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) wilfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

206. The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized

third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

207. In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see also Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

208. The Website, users' devices, users' browsers, and the Tracking Tools placed upon all of them, each qualify as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

209. Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, wilfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and the California Subclass members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

210. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

211. Plaintiffs and the California Subclass Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. The violation of section 631 constitutes an invasion of privacy.

AMENDED CLASS ACTION COMPLAINT

## COUNT V
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 638.51
### (On Behalf of Plaintiffs and the California Subclass)

212. Plaintiffs incorporate the allegations in paragraphs 1–120 by reference as if fully set forth herein.

213. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass Members.

214. California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, et seq.

215. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

216. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

217. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

218. California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" Cal. Penal Code § 638.51(a).

219. No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools designed to capture phone numbers, email addresses, routing information, addresses, and other signaling

- 58 -

AMENDED CLASS ACTION COMPLAINT

information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

220. Defendant is a "provider of electronic or wire communication service" under Cal. Penal Code § 638.51 as it provides electronic communication between the Website and Website users.

221. Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiffs and the California Subclass Members' activity on the Website.

222. Though Cal. Penal Code § 638.51(b)(5) allows for a provider of an electronic or wire communication service to use a pen register or a trap and trace device if prior consent of the consumer has been obtained, Defendant did not obtain consent from Plaintiffs or the California Subclass Members before using pen register or trap and trace technology to identify users of its Website, and has violated Section 638.51.

223. As a direct and proximate result of Defendant's conduct, Plaintiffs and the California Subclass Members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of § 638.51.

## COUNT VI
### VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code § 1770, et seq.
### (On Behalf of Plaintiffs and the California Subclass)

224. Plaintiffs incorporate the allegations in paragraphs 1–120 by reference as if fully set forth herein.

225. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass Members.

226. The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

227. Defendant is a person under the CLRA.

- 59 -

AMENDED CLASS ACTION COMPLAINT

228. Plaintiffs are consumers of Defendant's services under the CLRA, as Plaintiffs used Defendant's Website to browse health and care services and products, such as healthcare plans, and to compare insurance providers. Defendant itself states that it "provides the care and coverage you can count on…."[92]

229. Defendant undertook deceptive acts or practices in violation of the CLRA by fraudulently misrepresenting the ability of users to reject cookies on the Website. Defendant violated section 1770(a) of the CLRA by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services."

230. By this fraudulent misrepresentation, Defendant violated section 1770(a)(5) of the CLRA by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

231. By this fraudulent misrepresentation, Defendant violated section 1770(a)(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

232. Plaintiffs and California Subclass Members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

233. Pursuant to California Civil Code § 1780(d), Plaintiffs' CLRA Venue Declarations are attached hereto and are incorporated herein by reference.

## **COUNT VII**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, et seq. ("UCL")**
**(On behalf of Plaintiffs and the California Subclass)**

234. Plaintiffs incorporate the allegations in paragraphs 1–120 by reference as if fully set forth herein.

---

[92] *Why Choose Health Net*, HEALTH NET, https://www.healthnet.com/content/healthnet/en_us/find-a-plan.html (last visited Apr. 7, 2026).

- 60 -

AMENDED CLASS ACTION COMPLAINT

235. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass Members.

236. The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

237. By actively and purposefully installing a wiretap without a visitor's consent in violation of the Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

238. By actively and purposefully installing a pen register and trap and trace device without a visitor's consent in violation of CIPA, Defendant has violated the unlawful prong of the UCL.

239. By actively and fraudulently deceiving users about its ability to disable the Tracking Tools, Defendant has violated the unlawful prong of the UCL.

240. Defendant disclosed users' Sensitive Information without their knowledge or consent. Defendant disclosed users' Sensitive Information to Tracking Entities to build personal profiles without their knowledge or consent. Defendant fraudulently deceived users about its ability to disable the tracking pixels. Through this conduct, Defendant violated the unfair prong of the UCL.

241. Plaintiffs have standing to bring claims against Defendant under the UCL. Plaintiffs' Sensitive Information was tracked and recorded without consent. Plaintiffs' data was used to build personal profiles for advertising purposes without consent.

242. Plaintiffs would have considered it important to the decision to visit Defendant's Website to know that their data was being tracked and recorded without their consent, and regardless of privacy elections made through the Cookie Banner and Cookie Settings.

243. Instead, Plaintiffs exercised the Website's privacy controls and continued using the Website in reliance on Defendant's representations that non-essential cookies had been disabled and that Plaintiffs' Sensitive Information would not be shared with Tracking Entities.

- 61 -

244. Because of Defendant's UCL violations described above, Plaintiffs suffered injury by losing control of their personal data and having their Sensitive Information tracked and recorded without their consent.

245. Plaintiffs and California Subclass members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

## COUNT VIII
### COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
### (On Behalf of Plaintiffs and the Nationwide Class)

246. Plaintiffs incorporate the allegations in paragraphs 1–120 by reference as if fully set forth herein.

247. Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class members.

248. Defendant made affirmative representations to users through its Cookie Banner, Cookie Settings, and related disclosures that users could decline all non-essential cookies.

249. Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and performance cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

250. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

251. These representations were false and misleading. Before users, including Plaintiffs and the putative Class Members, were able to exercise the purported opt-in choice provided by Defendant, or otherwise decline all non-essential cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiffs' and the Nationwide Class Members' user data and transmit the same to the Tracking Entities, despite Defendant's

- 62 -

representation in the Cookie Settings that it would not track users until they consented to the use of Tracking Tools.

252. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, configured the Cookie Banner and Cookie Settings, and determined how those tools operated in relation to users' expressed privacy choices.

253. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

254. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

255. Plaintiffs and the Nationwide Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

256. Plaintiffs' reliance was reasonable because Defendant presented the Cookie Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of Sensitive Information.

257. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Nationwide Class Members suffered damages, including loss of privacy, loss of control over their Sensitive Information, and diminution in the value of their personal data. Plaintiffs and the Nationwide Class Members suffered injury,

- 63 -

including unauthorized disclosure of their communications, loss of control over their Sensitive Information, and loss of the privacy protection Defendant represented it would provide.

258. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

259. Plaintiffs and the Nationwide Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## COUNT IX
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Class)

260. Plaintiffs incorporate the allegations in paragraphs 1–120 by reference as if fully set forth herein.

261. Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

262. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Nationwide Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

263. It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

264. Plaintiffs and the Nationwide Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Nationwide Class Members. Equity and good conscience require restitution or

- 64 -

AMENDED CLASS ACTION COMPLAINT

disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Nationwide Class Members are entitled to the relief set forth below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. An order certifying the class and making all appropriate class management orders;

b. For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the respective Nationwide Class and California Subclass and their counsel as Class Counsel;

c. For an order declaring the Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiffs and the Nationwide Class and California Subclass on all counts asserted herein;

e. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) obtain the appropriate consent from Website users or (iii)_configure the Cookie Banner and Cookie Settings to operate as described;

f. An award of statutory damages or penalties to the extent available;

g. For damages in amounts to be determined by the Court and/or jury;

h. For pre-judgment interest on all amounts awarded;

i. For an order of restitution and all other forms of monetary relief;

j. An award of all reasonable attorneys' fees and costs; and

Such other and further relief as the Court deems necessary and appropriate.

AMENDED CLASS ACTION COMPLAINT

# DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

DATED: August 7, 2026           Respectfully submitted,

*/s/ Mark Jensen*
Mark H. Jensen*
mjensen@zlk.com
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore Maya (SBN 223242)
tmaya@ahdootwolfson.com
Yufei Wang (SBN 346170)
ywang@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*admitted pro hac vice

*Attorneys for Plaintiffs and the Proposed Class*

- 66 -

AMENDED CLASS ACTION COMPLAINT